Good morning. May it please the court, my name is Gus Flangus and I represent the appellant Dean Cero. Mr. Cero suffers from Parkinson's disease and after a hearing in front of the administrative law judge, he was denied disability insurance benefits as set forth in Title II of the Social Security Act. The hearing, the decision by the administrative law judge was unsupported by substantial evidence in the record. In addition to that, the administrative law judge failed to apply the appropriate legal standard and instead substituted his own medical judgment for that of the medical experts who presented at the hearing. Mr. Cero was diagnosed with Parkinson's disease in October of 2004. However, his last date insured was September 30th of 2002, two years earlier than that. And before I go on, it's important to note about Parkinson's disease. Parkinson's disease is insidious in nature. It's not one of those diseases where you have a symptom, you wake up one morning and then you go to the doctor and the doctor says, you have Parkinson's disease. This is a disease that starts oftentimes years before it's diagnosed. And to diagnose Parkinson's disease is not an easy thing because it's usually geared on a process of elimination of other diseases that may be present. Because a doctor cannot just come and say you have Parkinson's disease because there is no clear test. And if they diagnose Parkinson's disease without eliminating these other causes, they could treat that person improperly or that would result in adverse effect on the person if, in fact, they don't have Parkinson's disease. So again, it's one of those diseases that's insidious in nature and it creeps up and it takes a long time before it may manifest itself. Can't they just diagnose it by looking at certain features of the brain? That's one of the many tests. I'm not a medical expert by any stretch of the imagination, but there are many tests that they have to do and they do have to Now, the hearing, obviously that because the last date of insured was September 30th of 2002, by that time Mr. Cyril was completely disabled, unable to work any longer. Refresh our memory as to exactly what the symptoms were on that date. By that time, he was suffering from joint pain. He was suffering from stiffness. He was suffering from decreased sensations in his extremities, i.e., his legs. He had numbness. He had shaking. He had inability to rise, getting up out of the chair without a lot of aid. He had difficulty in walking. He had difficulty with his balance. He had difficulty just moving in general. These were things that actually started back in the late 1990s for him. And he had gone to the doctor very sparsely by that time, but the severity of these symptoms increased over time and really started manifesting themselves more towards around 2001 and really started manifesting himself more in 2002. In fact, in early part of 2002, he went to the doctor about 17 times trying to get some type of diagnosis on this. And again, it was two years later before they were able to diagnose this. When did he submit his application? His application was submitted in July 7th of 2005. That was about a ‑‑ it was after, you know, about six, roughly six months after he was diagnosed with the Parkinson's disease. So he had to show that he was disabled before 2000 and ‑‑ Correct. Because the burden on him is to establish when he goes to the hearing before the administrative law judge that he had ‑‑ he was disabled prior to his state last insured was September 30th of 2002. So he had to establish that. And the way he did that, he presented testimony or opinion, an opinion from his treating physician, a Dr. Michael Bach. In addition to that, he had an opinion from a non‑examining physician by the name of Dr. Burnick, who was a neurologist with the Cleveland Institute in Las And in addition to that, he had several individuals that had known him for years, neighbors, friends, his roommate, a former HR director from one of the places that Mr. Cyril had worked before. They all testified that they had seen him, exhibit these symptoms, was having trouble walking, et cetera. Let me ask this. Let's say that he, in fact, had Parkinson's disease on the date that his insurance coverage ended, but it was not so severe that he couldn't continue to work. Well, it was severe at the time that he couldn't continue to work. This is just a hypothetical. A hypothetical. What would we do with a case like that? In that, I would guess you would have to put on testimony as to the severity of his impairment at the time, and I would guess you would have to look at whether or not that impairment was keeping him from his profession. Again, you would also have to look at the profession itself. Is it one where, is he out working construction, working and digging ditches or something to that effect, or is he doing something, telemarketing, or whatever the profession may be. And so I think you would have to consider a host of those factors before you could make a ruling on that. Now, at the hearing before the administrative law judge, the treating physician, Dr. Michael Buck, reaffirmed that he did have Parkinson's disease and related his disability back prior to his date last insured, as did Dr. Burnack, who was a reviewing physician, a non-evaluating physician. He did the same as well. Now, the agency itself put on some evidence by their reviewing physician, who stated that, and this is kind of key I think to this, that he was not disabled as his date last insured, and they listed the date as of June of 2002. So I think the report was completely erroneous. Now, when you have this testimony from the various physicians, there is a hierarchy that is involved when these physicians testify. The treating physician is at the top of the pile, followed by an evaluating, non-treating physician, and then the last, the bottom part of the pile is the physician who merely reviews the records. Now, in this case, did he continue working after the date that is insured? He tried. He tried to do, and I mentioned kind of a telemarketing, not really a telemarketing job, he tried to do a telephone job, but that even was too difficult for him to do because one of the symptoms I failed to mention earlier was complete lack of stamina. He was just getting to the point just walking to the living room for him or going outside was impossible for him. Prior to the onset of his symptoms, he used to go on little mile walks with his neighbors, and those were some of the folks that testified about that. Even those little mile walks were no longer possible for him because of the loss in stamina. In fact, this is not in the record, but he just got out of the hospital after spending 10 days there. Where did the ALJ go wrong? The ALJ substituted his own opinion for that of the medical experts and did not follow the appropriate standard. I just was starting to talk about the hierarchy of the doctors who testify. When you have a treating physician, that doctor, his testimony or his opinion is supposed to be controlling. The only time, excuse me, if that opinion is uncontroverted, the ALJ can only discount that opinion if there is clear and convincing reasons given. If that treating physician's opinion is controverted, in this case it was not, the ALJ still has to give legitimate and has to give specific and legitimate reasons supported by substantial evidence in the record to discount that. What the ALJ did is completely discounted the testimony of the treating physician altogether. What he said is that this was really based on subjective or the opinion by the ALJ was based only on subjective evidence, meaning what Mr. Cyril was telling him, which is kind of ludicrous because how does a doctor know you have a  Then the other thing he said that the treating physician, Dr. Michael Buck, his opinion was nothing but pure patient advocacy, just came out of left field with that type of a ruling. In addition to that, if you look at the reviewing from the state agency, that opinion, that opinion by itself cannot constitute substantial evidence to overrule the treating physician. And what we have again from the reviewing physician from the agency is, one, he's completely wrong on the dates. Number two, that's all it is. He's a non-treating, non-evaluating physician. He's merely a reviewing physician at the bottom of the hierarchy. Let me ask you just one question about Dr. Michael Beck's opinion in 2006 when he writes a letter. I guess it's to you or somebody. I believe it was to the court, Your Honor, because I wasn't representing him at the hearing in front of the ALJ. It was sent to Gerald M. Welt. That's not me, Your Honor. I'm Gus Flangus. I'm with Flangus MacMillan Law Group. But at the end of that letter, it's a letter dated January 11, 2006. That's correct. Okay. At the very end, he says, or opines, based upon these symptoms after he had gone through all the symptoms that he had diagnosed back in 2000, the last time he had seen Mr. Ciro, he said, based on all these symptoms, Mr. Ciro's inability to continue to do even part-time work and the diagnosis of Parkinson's by Dr. It is medically probable that these symptoms were progressive and fully debilitating within a year or two of his last examination. And I took that to mean the last examination by Dr. Michael Beck back in 2000. Am I wrong? I'm not sure. I think what he was talking about, because I do have it in my brief, is that he was talking that he was disabled about two years prior to the date last insured. I think that's what the, but that's not what he says. That was my view, my interpretation. So the ALJ says, well, his, this opinion is just too vague and there's no basis for it and just kind of dismisses it completely. He just says it's vague. Like I said, it's pure patient advocacy and he completely dismisses it again. Not given deference that that Dr. Michael Bach was the treating physician. I will point out that Dr. Michael Bach had been his treating physician prior to 2000, but actually back in 1997, 98 and and on one of the things in the record shows Dr. Michael Bach writing that Mr. Cyril was completely disabled for that one job as of 2000. And it was my understanding from the entire record that Dr. Michael Bach was relating back the disability that Mr. Cyril was suffering back prior to the date last insured. Now is Mr. Burnick a treating physician or he was a reviewing physician. He's the third in that hierarchy. So you had the treating physician. There was no evaluating physician. That's somebody who evaluates but does not treat and at the bottom of that is the person the doctors that review and Dr. Burnick was a reviewing physician. He reviewed the records of the entire file and he came up with that diagnosis as well. I thought Dr. Burnick made prescribed some medication for him. I'm unfamiliar if he did or not your honor. I'm here just talking about the ALJ portion of the hearing. Does really make a difference whether or not it ultimately proved to be Parkinson's or is the question whatever he had prior to September 30th 2002 was disabling to him. I believe it's a combination of both your honor. I think it has to be was he disabled prior to the date last insured and the question on that thing is yes. As far as the diagnosis for Parkinson's disease and the reason I was waffling with the yes and no answer on this is because there are some ailments that may be disability this disabilitating on a temporary basis and may not be permanent and so I think the Parkinson's disease diagnosis is important to the query because it shows that he had those symptoms. He was disabled prior to the date last insured and the ailments he were suffering from are permanent in nature. I see the other question I have is that as I looked at dr. Michael Beck's statement. He indicated he definitely was not able at the prior to the 2002 was not able to perform his prior work. The question is whether he was able to perform some work. The answer is in the record your honor. He was he did leave the one job in 2000 went to another one and then tried to do some work that was more sedentary in nature and because of the disability disabilitating nature of the disease. He was no longer able to even do that. Was this prior to 2002 prior to 2002 your honor that he would know you not able to perform any work. That's correct. How about the things that he was doing at home on the telephone that was part of it and as I answered earlier, it's one of the big symptoms that he was encountering was the lack of stamina and again, it was getting to the point where even trying to do stuff on the telephone was becoming arduous for him and he was actually let go because he didn't have the stamina to do that and furthermore, you know, just telephone jobs are not that easy to come by in of themselves. I believe that's my time and I thank you very much. Okay. Thank you counsel. Good morning, your honors. My name is Elizabeth Fair. I represent Michael Astru, the commissioner of Social Security in this case. A claimant, a disability claimant has a plain obligation to prove disability while he's still insured with objective medical evidence. The ALJ stated this claimant's attempt to build a case for disability prior to his date last insured is neither supported by the evidence nor by his own complaints as they existed prior to September 30th, 2000. That's an absolutely unassailable account of this record. We have no treatment records in 2001, which is the year he alleged he became disabled. In 2002, yes, it's true. He saw the doctor on more occasions, but what's really relevant is what's in those treatment records. He saw his cardiologist, Dr. Green, at least six times in 2002. Not once does he complain of symptoms related to Parkinson's disease, nor does  Green mention any symptoms of Parkinson's disease. The claimant also saw... He's a cardiologist, though. Right. But I, and along those lines, claimant wants the court to believe he would have told his friends and neighbors all about his symptoms of Parkinson's disease, but somehow he doesn't mention them and they're not observed by a trained medical specialist. That doesn't make any sense. And Dr. Green is not the only doctor who treated him during 2002 who didn't note any symptoms of Parkinson's disease. Well, as you look at the record, by May of 1998, it seemed that he had some serious symptoms. And by June of 2000, more serious. In 2002, possible heart problems are added to it. It's odd to me that the testimony of the people who could observe him, his friends and neighbors, was not admitted. Now, I had a partner in the law firm who had Parkinson's and I could have diagnosed a serious problem. And in those circumstances, I think I should have been able to testify that his handwriting had become illegible, that he was having trouble remembering names. He was very, very tired. A man who'd been energetic. Now, that kind of testimony, the ALJ should consider, and he didn't here. He did consider it. He mentions that the third-party statements from the claimant's friends are not persuasive. They're similar accounts to what the claimant said in the NAR, and the ALJ properly found the claimant not credible. Claimant didn't challenge that finding in his opening brief. He tries to reprise the argument in his reply brief, but it's not proper. And to address your comments about observations of someone with Parkinson's, I grew up watching someone with debilitating Parkinson's who eventually died also. And it's very obvious, the symptoms of Parkinson's disease. This claimant has never been noted to have tremors, even as far as Dr. Horan, who addressed his condition in January 2004, expressly notes no tremors, expressly notes very little complaints with his lower legs, normal mental status, normal gait and coordination. This is January 2004, well after the date last insured, and there's still no significant observations by medical professionals. Did the ALJ take any, take account of Dr. Bernick's? He didn't. And that's, and Dr. Bernick, I'd like to clear something up. He was a treating physician. And I would also, along the theory I was going to. I thought I read where Dr. Bernick had prescribed some medication. And he most definitely was an examining doctor and treating, actually. And Dr. Bernick's last treatment record in the record is February 2006, where he notes normal motor tone, which is, takes into account one of the symptoms of Parkinson's, which is stiffness. If he has normal motor tone, he doesn't have severe debilitating, crippling Parkinson's disease. He also noted at that time, February 2006, no tremor present and that the claimant was still not exercising as recommended. But back to Dr. Bernick's, the fact that the ALJ didn't address it. It's, it's harmless error. There's no reasonable way the ALJ addressing that letter would have changed the outcome. And then he dismissed the, the, the opinion of Dr. Michael Bach. Correct. And let me, let me address. 2006 opinion. Yes. Let me address Dr. Bernick first. Is that really telling us why he was rejecting Dr. Bernick? Oh, I think he gave reasons why. He said it was patient advocacy. He said it was unsupported and vague. Why, why would you, why would he call it patient advocacy? I, I, I haven't, because Dr. You say that all the time. Well, here's, here's why. This, this doctor treated the claimant for a long time from, I think he says 1983 in his letter. There's, the claimant was working the entire time Dr. Michael Bach was treating him. He stopped treating him in June. The last time he saw him was June 2000. Claimant's alleged onset date isn't until February 2001. During the entire time Dr. Michael Bach is treating him, he's working. He's, and I would also like to point out the ALJ also said it's not just the objective evidence in the record that doesn't support the claimant's disability allegations. It's in his complaints. He's complaining of muscle stiffness once in a while, swelling in his legs, which is usually at night and resolved with quinine. That's all over the record. He's complaining of difficulty getting up from a sitting position. None of these things would preclude sedentary work, which is what the ALJ, the jobs the ALJ found the claimant could return to. Dr. Dr. Brink didn't treat the claimant until, this is why it's harmless there. He didn't treat the claimant until September 2004, almost two years after the date last insured. The letter he wrote is, is dependent in part on Dr. Michael Bach's letter, which the ALJ properly rejected. And he, he mentions that the symptoms were maybe present starting 2003 or 2004. That's again, after the date last insured. And I would, I would really like to draw the court's attention to this. This, this isn't in our briefs, but there is, as I mentioned, a few of these things that after the DLI, there's still observations from doctors that are not consistent with crippling, debilitating Parkinson's disease. And those are from Dr. Horn, no tremors in January, 2004. From Dr. Burnick, normal motor tone, no tremors in 2006. Also, the first time claimant went to physical therapy, he, it was, he did a self-report. This is May 2005. He self-reports that he most enjoys walking, folk dancing, and gardening. That's not past tense. Five days later, a physical therapist notes normal or almost normal motor strength, normal leg sensation, and, quote, no visible signs of Parkinson's disease. This is at page 199 in the ER. And that's from May 2005. In August 2004, the claimant has an antalgic gait and transfers, but he still has full leg strength, and there's still no observations of Parkinson's disease. This is, claimant wants everyone to believe that he told all of his friends and neighbors about his symptoms, that they were so obvious, they noted them and reported them in letters. But mysteriously, these symptoms are not observable when he goes to a doctor. The ALJ's, again, his, his conclusion that this record doesn't support objectively or subjectively prior to this, not in September 2002, that this claimant had a disabling condition. Did you say that the ALJ just completely rejected Dr. Mickelbach's letter? He did reject the letter, Your Honor. Based on, he said it was, um. Patient advocacy. Vague, vague patient advocacy. And vague. Yes. It is vague. There's no. He didn't tell us why it's vague. But he didn't reject it, did he, or did he? Yes, he did. He said, I give it no weight. No weight. And that's on page 36 of the ER, 34 in the administrative transcript. The doctor's opinion, he didn't assess any limitations. He didn't explain. It's basically just, he, he. He says, he says in his letter, I'm reading the letter right now. At the time of the last exam, 6-30-2000, Mr. Cyril was no longer able to perform physically demanding and highly stressful work he had formerly done. He didn't perform physically demanding work. He performed sedentary jobs. Well, whatever. But that's, that's the question here. We're saying he can return to sedentary work. His doctor is. The question here at the moment is whether the doctor was vague in what he said, and he wasn't. Well, a doctor's, that's, that's an administrative conclusion that this claimant couldn't work. There are no assessed limitations in that letter. It's just basically, he can't work because I say so. There's nothing supporting that. This doctor didn't even recognize symptoms. You look at those 14 diagnoses he made back in June 2000, none of them are even related to Parkinson's disease. And he is, he said he had serious arthritis and that was his diagnosis early on. But he's still working. But he was prescribing medication at that time for cramping. He gave him a quinine sulfate. Which worked. Yeah, it did, but it was not a treatment for arthritis. That's true. But, but how are cramps that are resolved with quinine disabling symptoms? And, and that's neither Dr. Burnick nor Dr. Mikkelbach assessed any limitations. They basically said he can't perform his former work. They make no. How old was he when he applied for, when he applied for benefits? He applied in 2006. So he was 50, 62 at that time. His date last insured he was 58. But this is, these are, this is very much like this court's decision in Antony, where we had a retrospective letter from a treating doctor who says he can't perform his customary work without any explanation of what that customary work was. It's clearly erroneous that Dr. Mikkelbach, what he thought the job was. Sedentary jobs are by definition not physically demanding. There's nothing in this record that supports that his past work was highly stressful. Excuse me. He didn't say physically demanding. The problem was that work that is demanding and stressful. Your Honor, on page, oh, I'm sorry. On page 228 of the excerpts of record, quote, Mr. Serra was, as of 6-32,000, Mr. Serra was no longer able to perform physically demanding and highly stressful work he had formerly done. Sedentary work is not physically demanding. Well, I don't know. Well, ours is. I can tell you at the end of the day, it's been very physically demanding. This is my second day up here. I completely concur. But this is, this doctor is talking about physically demanding work that he never identifies, much less describes. That's vague. That's, the ALJ permissibly considered that letter written six years after this doctor last saw him, four years after the date last interviewed him. He's insured almost three and a half, but that's patient advocacy. That's, I don't know what else could be. This is, he's assessing that this claimant can't work without any objective support. And I would like to, if you have any more questions for me, I'd be happy to answer them. But I would like to say that the magistrate's reporting recommendation, which was not objected to, is a very succinct and concise explanation of why this is substantial evidence and why it should be upheld. Thank you. You have a minute. Oh, you have nothing further. Okay. That's fine. All right.  That's fine. Matter is submitted. Thank you, counsel.
judges: Hug, Fletcher, Paez